IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On Briefs October 28, 2004

IN THE MATTER OF C.M.S.; STATE OF TENNESSEE DEPARTMENT
OF CHILDREN'S SERVICES v. LISA HOWELL, ET AL.

A Direct Appeal from the Juvenile Court for Madison County
No. 29-24,782     The Honorable Christy R. Little, Judge

_____

No. W2004-00295-COA-R3-PT - Filed November 19, 2004

_____

This is a termination of parental rights case. Mother appeals from the order of the Juvenile Court of Madison County, terminating her parental rights on the grounds of persistence of conditions. Specifically, Mother asserts that the termination of her parental rights is not supported by clear and convincing evidence in the record, and that termination is not in the best interest of the children. We reverse and remand.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed and
Remanded

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Roger Stanfield of Jackson for Appellant, Lisa Howell

Paul G. Summers, Attorney General and Reporter; Elizabeth C. Driver, Assistant Attorney General, For Appellee, Tennessee Department of Children's Services

OPINION

Lisa Gail McAnally Howell ("Howell," "Mother," or "Appellant") is the natural mother of C.M.S. (d.o.b. 7/12/90). C.M.S. is mentally retarded. The record shows that C.M.S.' IQ is around 49 and that she functions at the level of a five or six year old child. At the time of C.M.S.' birth, Howell was not married to John Shields but they were living together. John Shields is listed as the father on C.M.S.' birth certificate. John Shields and Howell eventually married.[1] In their

_____

[1] John Shields had previously been married to Doris Shields and had two children with her, Roy and Jesse.

subsequent divorce, John Shields was awarded custody of C.M.S. and Howell continued to have contact with the child.[2]

C.M.S. came into the State of Tennessee Department of Children's Services' ("DCS," or "Appellee") custody on May 18, 1997, after DCS received a report that C.M.S. had been sexually abused by John Shields. C.M.S. has been in foster care continuously since that time. On August 30, 2002, DCS filed a "Petition to Terminate Parental Rights" of Howell and John Shields (the "Original Petition").

On December 6, 2002, on the motion of the guardian ad litem, the trial court ordered parentage testing. A DNA test conducted in December 2002, and admitted as Trial Exhibit 1, excluded John Shields as the father of C.M.S.[3] Howell informed a case worker that Roy Shields, the adopted son of John Shields, was the only other possible father of C.M.S. On April 1, 2003, DCS filed an "Amended Petition to Terminate Parental Rights" (the "Amended Petition"). The Amended Petition incorporates the Original Petition by reference and asserts, against Roy Shields, all grounds listed in the Original Petition.[4]

A hearing was held on July 22, 2003 and July 29, 2003. On January 20, 2004, the trial court entered its "Order Terminating all Parental Rights of Lisa Howell and Order Awarding Full Guardianship to the Department of Children's Services" (the "Final Order"). The Final Order reads, in relevant part, as follows:

> 2. That the child has been removed from the parent's home as a result of a petition filed in the juvenile court in which the child was found to be dependent and neglected, as defined in TCA 37-1-102, and placed in DCS custody and that DCS made reasonable efforts to assist the parent for the four months following the removal to establish a suitable home for the minor child but the parents made no reasonable efforts to provide a suitable home and ha[ve] demonstrated a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date.

---

[2] John Shields and Howell have two other male children. These children were not removed to State custody.

[3] Upon motion of DCS, by Order of May 27, 2003, John Shields was dismissed from this case "as he is not the biological father of the minor child and as he therefore has no legal interest in the child." John Shields is not a party to this appeal

[4] On July 8, 2003, an Order was entered terminating the parental rights of Roy Shields and he is not a party to this appeal

3. That the child has been in the care of the State of Tennessee, Department of Children's Services, continuously since the date of removal.

4. That there is no reason to continue the parent-child relationship given the above facts. The child needs to be placed for adoption as soon as possible so she has the best chance of achieving a stable and permanent home.

5. That it is in the best interest of the above-named child that the Respondent's parental rights be terminated, because:

a) Lisa Howell has failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in her home; and,
b) Lisa Howell has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; and,

\*                           \*                           \*

10. That it is in the best interest of the child and the public that all the parental rights of the Respondent mother, Lisa Howell to [C.M.S.] be forever terminated and that complete custody, control and complete guardianship should be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to such adoption in *loco parentis*.

**IT IS THEREFORE, ORDERED, ADJUDGED, AND DECREED:**

\*                           \*                           \*

2. That all of the parental rights of Lisa Howell to the said child be, and the same, are hereby forever terminated and that said termination is in the child's best interest.

\*                           \*                           \*

5. The Court finds that the Department has made reasonable efforts to achieve the child's permanency plan goal by filing the petition to terminate parental rights and pursuing termination. Further, that there

is no less drastic alternative at present to the continued removal of the child and that the child's continued care and custody with the department is necessary and continuation of the child's custody or return of the child to the custody of her parents is contrary to the best interest of the child at the present time.

The Final Order incorporates by reference the trial court's findings made at the hearing.

Howell appeals from the Final Order and raises two issues for review as stated in her brief:

> 1. Whether the trial court erred in entering an order of termination of parental rights unsupported by findings of fact.
>
> 2. Whether the trial court erred in failing to conduct a "best interest" analysis.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

T.C.A. § 36-1-113(c)(Supp. 2004) governs termination of parental rights and requires that such termination be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interest of the child. The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id*. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds, *In re: Swanson*, 2 S.W.3d 180 (Tenn.1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky*, 455 U.S. at 769; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* Tenn.Code Ann. § 36-1-113(c)(1) (Supp.2003); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel v. Messier*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel v. Messier*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App.1981); *Brandon v. Wright*, 838 S.W.2d at 536.Grounds for Termination

The trial court terminated Howell's parental rights on the ground of persistence of conditions, which is codified at T.C.A. § 36-1-113(g)(3)(A)(Supp.2004):

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The trial court made the following, relevant findings concerning the grounds for termination:[5]

> Now, my Findings of Fact are–the testimony is clear that [C.M.S.] will never be able to return to live with her mother. I don't

---

[5] As noted *supra*, these findings were incorporated by reference into the Final Order of the trial court.

see that her mother would ever be able to put herself in a situation–and some of that is perhaps not her fault. But she is not in a position to be a mother in that I think her mentality is more childlike than we even realized until we got into Court and heard the testimony....

I don't think anyone had any issue about the grounds–clear and convincing evidence. I'm not going to find that there was any abandonment because she never missed visits with the child, and she has been very–was very conscious–the mother was about making those visits with [C.M.S.] and if she had been under a Court Order [to pay child support] would simply not have been able to comply and would not have had the income. So, I'm not going to make the finding on abandonment, but I am on clear and convincing evidence that persistent conditions still exist and I think they always will exist in regard to the mother and her situation–and that being from one man to the other, from one home to another, no employment, and from what we found out in court some of that having to do with the fact that she [Howell] can't read and write....

We have reviewed the entire record in this case and we find that there is clear and convincing evidence to support the trial court's finding on persistence of conditions. The persistence of conditions in this case is two-fold. On the one hand, we have a child who, in all likelihood, will never be able to live independently. The record indicates that C.M.S. needs constant supervision because she has low impulse control and often puts inappropriate items in her mouth. Furthermore, C.M.S. cannot be left alone with other children because she has acted out inappropriately on children in the past. C.M.S.' low IQ, coupled with her mental, emotional, and behavioral problems, indicates that there is little likelihood that she will grow out of these behaviors. On the other hand, we have a Mother who has an eighth grade education, who cannot read or write, who has not been able to procure employment, and who has no stable housing. By her own testimony, Howell lives most of the time in John Shields' home and spends weekends with her boyfriend. The photos in record and the testimony concerning the condition of John Shields' house evince that it is not a suitable environment for C.M.S. First, John Shields, the person accused of molesting C.M.S., resides there. The record shows that Howell has a history with abusive men. There is no indication that this pattern has been arrested or that Howell has been, or will be, able to protect not only herself but also C.M.S. from physical abuse. Also, C.M.S.' two half-brothers, John and Chris, live in John Shields' home. As noted above, C.M.S. has acted inappropriately with other children in the past. Consequently, to place C.M.S. back in that environment, would be to put these two children in jeopardy as well. In addition, the photos show a home and yard that are cluttered with trash and debris. Given C.M.S.' proclivity to put items in her mouth, it is likely that she would harm herself if left unsupervised in this environment. However, even if Howell was living in a stable and clean environment, there is no indication in this record that she has the skills or training necessary to care for a child with such advanced special needs as C.M.S. The record supports, by clear and convincing evidence, the trial court's findings that conditions are such that C.M.S. would be subjected to further

harm, abuse and/or neglect if placed in the care and custody of Howell. Given C.M.S.' limitations and the fact that Howell has not been able to maintain stability in her own life, there is little probability that these conditions will be remedied at any time in the near future.

Best Interest

After a finding that the grounds for termination have been established by clear and convincing evidence, the court must then determine if termination is in the best interests of the child. T.C.A. § 36-1-113(c)(2). Section 36-1-113(I) (Supp. 2004) enumerates the following factors courts are to consider in making the best interests determination:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i).

In its findings from the bench, the trial court made the following, relevant statements concerning C.M.S.' best interest:

>In the case at hand, there is no doubt that the initial grounds have been met, which are persistent conditions. This is very difficult–very difficult. The Court feels that it has to give [C.M.S.] an opportunity to have a permanent home with these caveats. The Court would ask the Department to continue visits with the mother on a regular basis until an adoptive placement can be found and hopefully even after placement if that family is willing. That the Department will make every effort humanly possible to find a family willing to adopt a special needs child with the understanding that she has a very supportive foster family and a mother who regularly visits prior to this termination and will hopefully continue, include–encourage the adoptive family to allow the child to be with her mother although I don't even know that at this time [C.M.S.] understands that her mother–her natural mother is actually her biological mother....

>        *                              *                              *

>It is further the Finding of The Court that it is in the best interest of the child that she have an advocate at eighteen, and it certainly will not be her mother. So, if she is eighteen and there is no adoptive family, her mother could certainly not be her advocate. And that is another best interest of the child argument. Therefore, The Court finds that it is in the best interest of the child that [C.M.S.] be allowed to be placed in full guardianship....

Although this Court recognizes that much of the evidence in record is not favorable to Howell in some particulars, including the fact that she has no prospects of employment in the near future, her past failure to provide a safe and suitable home for the minor child in the face of abuse, her lack of education, and the fact that Howell had no suitable residence for the child at the time of trial. However, this court must balance this evidence with the situation as it pertains to C.M.S. C.M.S. is a special needs child who has specific learning, emotional, and behavioral problems. All reports indicate that C.M.S. is in need of continued counseling, therapy, and supervision. Under the current arrangement, C.M.S. resides in a therapeutic foster home under the care of trained foster parents. This foster home had served as a stable and supportive environment for the minor child for nearly six years at the time of the trial.[6]   In addition to the care C.M.S. receives from her foster parents, the child is also enrolled in a local school where she benefits from a special education

---

[6] The foster parents are of advanced age and the testimony indicates that they are not able to adopt C.M.S. or to provide long-term (i.e. life long) care for C.M.S.

curriculum. The positive and stable influence C.M.S. receives from her foster home and special education classes is further strengthened through regular supervised visitations with Howell. Pat Wiley, the DCS case manager, testified that Howell has maintained regular visitation with C.M.S, and further noted that Mother and daughter share a bond:

> Q. Okay. Now, throughout the years, has Lisa [Howell] exercised regular visitation with [C.M.S.]?
>
> A. Yes.
>
> Q. What have you observed about that visitation at first and then later on?
>
> A. Well, initially they started visiting, her and John [Shields] and the boys [C.M.S.' half-brothers], they would visit. She [Howell] really didn't interact too much with [C.M.S.], initially. We had to kind of coach her to spend some time with [C.M.S.] because she [Howell] would be doing other things besides visiting with her, she would do things with John. But she really wouldn't bond or spend time or interact with [C.M.S.].
>
> Q. And has that situation changed?
>
> A. Yes, it has changed.
>
> Q. How has that changed?
>
> A. After we started coaching her [Howell], pretty much encouraging her to spend a little more time with [C.M.S.], then she started doing that and she started bringing her gifts to the visits and just really started bonding with her.

The testimony of Paula Poole, Resource Coordinator with therapeutic foster care for Omni Vision, indicates that C.M.S. also has a bond with her younger half-brother, Chris:

> Q. And what did you observe as far as the interaction between [C.M.S.] and Mr. Shields and Ms. Howell during those visits?
>
> A. [C.M.S.] enjoys playing with her brothers. She has more interaction with Chris. Her and John [Jr.] have more conflicts between each other; that Ms. Howell would bring stuff to play with [C.M.S.], do the makeup, do the hair; that she [Howell] would interact with her [C.M.S.]...

&ast;      &ast;      &ast;

Q. Have the brothers come along [to visitation]?

A. The brothers have come.... [C.M.S.] mainly played with Chris. John [Jr.] would join in but there would be conflict, and that Ms. Howell would go and interact with the kids and play with them.

&ast;      &ast;      &ast;

Q. I think you said that she [C.M.S.] gets along really well with Chris?

A. Yes.

Q. I think she refers to Chris as "My Chris."

A. Right.

Q. She loves him very much?

A. Yes.

There is no evidence to suggest that C.M.S. is overly upset when these visits end. In addition, when C.M.S. was question by the trial judge *in camera*, she indicated that she would not be upset if she could no longer visit with Howell. However, given this child's IQ, and testimony in the record to indicate that C.M.S. does not always grasp the nature and/or gravity of termination and adoption, this Court is not convinced that C.M.S.' testimony should be given a great deal of credence or weight in deciding the issue of best interest. This is especially true when C.M.S.' testimony is coupled with the testimony of the foster mother and the case workers that C.M.S. very much enjoys the time she spends with Howell.

The care, supervision, and training provided in the foster home and school programs, combined with the documented fulfillment and joy the child experiences through regular visitations with her mother and half-brothers, has created a stable "home" environment that serves as an emotional anchor for this child. It is this Court's concern that termination of Howell's parental rights could severely disrupt C.M.S.' life. Although there is no proof in the record as to whether termination would have such an effect, a psychological evaluation of C.M.S. is desirable and necessary to determine if termination would cause the child to regress.

Furthermore, the concerns regarding the instability of Howell's living arrangement and her inability to properly care for C.M.S. are somewhat diminished under the present circumstances of supervised visitation. There is no evidence in the record that Howell's visits hinder C.M.S. or have

a negative impact on C.M.S.' emotional status. Moreover, because C.M.S. resides in the exclusive physical custody of her foster parents, the physical or permanent condition of Mother's home, under these particular circumstances, is irrelevant.

The trial court's conclusion that termination is in C.M.S.' best interest because the continuation of the parent/child relationship would hinder DCS' efforts to find a suitable adoptive home for C.M.S. is not well founded. It would appear from the trial court's statements concerning the post-termination visits by Mother that the trial court has misgivings about the best interest of the child in an absolute termination of parental rights. While it is reasonable to assume that as a child ages, her chances of adoption generally diminish, we stress that C.M.S. is fourteen years old, and note that there is nothing in the record to indicate that she is a subject for adoption or currently has reasonable prospects for adoption. Based on C.M.S.' advanced age, and her learning, emotional and behavioral difficulties, this Court is not optimistic that the child is or would be a likely candidate for adoption. Therefore, under the exceptional circumstances of this case, to deprive C.M.S. of her only natural family relationships, without any evidence of adoption prospects, may not be in her best interest.

Considering all of these factors and the effect that Howell's parental termination at this time would have on the child, we believe that it is in the best interest of the child that the present situation of supervised visitation be continued. However, to be perfectly clear, this Court does not conclude that C.M.S. should be removed from her current foster home to Howell's custody. However, given the grave and permanent nature of this proceeding, the fact that some level of bonding has occurred between C.M.S. and Howell, and the fact that the psychological effects of a permanent severance of the Mother/child relationship on this child have not been fully explored, we find that the evidence preponderates against the trial court's finding of clear and convincing evidence that termination is in the best interest of the child. This is not to say that termination of Howell's parental rights at some future time is foreclosed.

This Court, in no way, advocates a return of custody to Howell at this time, or any time, unless she makes a vast improvement in correcting the conditions reflected in this record. However, we cannot overlook the possible effect on C.M.S. in the termination of her Mother's parental rights. This child is fourteen years old with a multitude of problems and no prospects for adoption into a stable family environment. She has very few positive things in her life and the evidence is clear that she enjoys visiting with her Mother and half-brother. Without further evidence as to what effect the severing of the bond with Mother and half-brother will have, we cannot say that it is in C.M.S.' best interest to take these relationships away from her. Therefore, a psychological evaluation of C.M. S. should be required to assist in making this determination.

Accordingly, we reverse the trial court's Final Order, terminating the parental rights of Howell. We remand this matter for such further proceedings as may be necessary consistent with this Opinion. Costs of this appeal are assessed one-half to the Appellant, Lisa Howell, and her surety, and one-half to Appellee, Tennessee Department of Children's Services.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.